# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF UTAH, CENTRAL DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | Case No. 2:11CR811 DN |
| Plaintiff, | : | **FINDINGS OF FACT AND CONCLUSIONS OF LAW DENYING DEFENDANTS' MOTIONS TO SUPPRESS** |
| vs. | : | |
| RODOLFO GUTIERREZ-SANCHEZ, IRAN ESCOBAR-VELAZQUEZ, and PEDRO ULISES BAUTISTA-MEDINA, | : | |
| Defendants. | : | Judge David Nuffer |

The parties appeared before the Court on June 21-22, 2012 for an evidentiary hearing on the Defendants' Motions to Suppress. The Court makes the following findings of fact and conclusions of law with respect to these motions.

## FINDINGS OF FACT

1. On August 20, 2011, Salt Lake City DEA Agents intercepted call number 2037, in which an individual known only as Pina told Javier Armenta that he (Pina) was going to personally come to Utah to make drug deliveries. Transcript of Evidentiary Hearing on Motion to Suppress Evidence, June 21-22, 2012, page 196, docket nos. 312 (pages 1-180) and 313 (pages 181-480), filed July 11, 2012. (Hereinafter "Tr. at ___".)

2. On August 22, 2011, Agents obtained a State of Utah GPS location warrant for the telephone used by Pina to call Armenta on August 20th. Tr. at 197.

3. On August 23, 2011, Agents intercepted a telephone call in which Pina told Armenta that he (Pina) would be traveling to Salt Lake City within a day or two. Tr. at 22 and 27.

4. On August 24, 2011, Agents received information through the use of the GPS locator warrant, that the Pina cell phone was moving from Modesto, California to Sacramento, California, and then onto Interstate 80 Eastbound toward Nevada and Utah. Tr. at 114-115.

5. On August 25, 2011, at about 3:30 a.m., Agent Williamson, who was set up along Interstate 80 in Wendover, Nevada, observed a white Nissan Altima registered in Modesto, California, with a lone Hispanic male driver, traveling Eastbound toward Salt Lake. Although GPS locator information was not being received at that time, Williamson and other agents determined that the vehicle and its occupant were consistent with the information that they had about "Pina". Tr. at 28-31.

6. Shortly after that initial observation, Trooper Neff, at DEA's request, stopped the white Nissan for observed traffic violations. A narcotics-trained K-9 was deployed on the vehicle, whereupon it indicated positive for the odor of narcotics. Tr. at 31.

7. The vehicle was searched, but no narcotics or other illegal items were found. Tr. at 31. Several cell phones, one of which did not contain a battery, were located in the vehicle. Tr. at 199. No GPS location information can be received from a telephone if the battery is removed. Tr. at 199.

8. The driver was identified as Pedro Bautista-Medina. Following the search, the driver and vehicle were released. Tr. at 32.

9. On that same date, August 25, 2011, at approximately 10:30 a.m., officers again began receiving GPS location information on the cell phone that "Pina" used to call Armenta in the preceding days. The location of the telephone was shown to be in the area of Orion Circle, in Salt Lake City, Utah. Tr. at 33.

10. At around the same time, Agents intercepted a call from Pina to Armenta in which Pina told Armenta he was in the area. Armenta told Pina to call him back in a couple hours. Tr. at 35; 322-323; 374.

11. Shortly after receiving that information, Agents established surveillance on Orion Circle. Agents were familiar with the location, as an individual known only as "Pariente", who was also part of this same drug investigation, was believed to live at there. Tr. at 36.

12. Agents observed the white 2002 Nissan Altima, with the same license plate out of Modesto, California as observed near Wendover, Nevada earlier that day, parked in a parking lot near the Orion Circle home. Tr. at 36. The location of that vehicle was unknown to law enforcement between the time it was released by Trooper Neff and the time it was observed at Orion Circle. Tr. at 374.

13. At approximately 10:45 a.m., while surveillance Agents were observing Orion Circle, Agents intercepted another call (Call #2382) between Pina and Armenta. Armenta asked Pina if he brought his cousins. Armenta asked if they were light or dark, good looking or not? Pina responded that he brought 4 cousins, but that two were already out working so only two were available. Tr. at 329-332 and 379.

14. While on surveillance at Orion Circle, officers observed a gold Nissan Maxima arrive at the residence. The gold Maxima was familiar to officers from the investigation, as it had been observed at prior suspected drug transactions involving the subject known as "Pariente". Tr. at 36-37.

15. At Orion Circle, officers did not observe anything being moved from one car to the other, or from the residence into either car. Tr. at 79-80.

16. At approximately 12:20 p.m., Agents intercepted another call (Call #2397) between Pina and Armenta. Armenta told Pina to "come where I am" and to "bring the twins over." Tr. at 45 and 336-337.

17. Agents knew from the Armenta investigation and from surveillance that day that Armenta was at the Mi Ranchito Restaurant at approximately 3600 South State Street in Salt Lake City. Tr. at 45; 337; 384. Agents also knew from the context of previous calls and prior drug seizures

that the terms "twins" and "cousins" had been used to refer to pounds of methamphetamine. Tr. at 40-41 and 330-333.

18. Some time after the 12:20 call, officers observed the individual known only as "Pariente" (later identified as Iran Escobar-Velasquez) leave Orion Circle in the white Nissan Altima. Officers also saw the individual known as "Pina" (who had been previously identified as Pedro Bautista-Medina through documents submitted to Trooper Neff earlier that same day) leave Orion Circle at the same time, driving the gold Nissan Maxima. Tr. at 45-46 and 49.

19. Both vehicles were observed moving from the Orion Circle address to 771 West Remmington. This address had previously been identified in this investigation as being the residence of an individual known as Rodolfo Gutierrez-Sanchez. Tr. at 50. GPS locator information showed the telephone used by "Pina" to speak with Armenta as traveling from the Orion Circle address to the Remmington address at the same time the vehicles and named individuals were observed traveling between those two locations. Tr. at 440-442.

20. At the Remmington address, officers observed items being taken out of the white Nissan Altima and being placed in the gold Nissan Maxima. Tr. at 51-52. Officers were not able to maintain continuous surveillance on both vehicles while at the Remmington address, however, because the home and driveway are on a flag-type lot where the view to the rear of the house is obstructed. Tr. at 386.

21. After some time at that address, the white Nissan Altima was parked on the street near the home, and Pina, Pariente, and Rodolfo Gutierrez-Sanchez all got in the gold Nissan Maxima and started driving South on 800 West, turning Eastbound onto 1300 South where they soon entered Interstate 15 Southbound. Tr. at 386-387.

22. The gold Nissan Maxima exited the Interstate on 3300 South and proceeded Eastbound, consistent with the shortest/easiest route of travel between Remmington and the Mi Ranchito on 3600 South and State Street. Tr. at 387.

23. While officers were attempting to arrange for a wall stop of the Maxima by a marked patrol unit, the Maxima was driven into the 7-11 parking lot on the corner of 3300 South and 300 West. Tr. at 55-56 and 387-388.

24. As the occupants of the Maxima were pumping gas and acquiring items inside the convenience store, a marked South Salt Lake Police car pulled into the 7-11 parking lot. This police car was unaffiliated with the investigation of the Maxima and its subjects. Tr. at 56.

25. Officers testified that before the South Salt Lake police officer arrived at the 7-11, the three individuals from the Maxima acted normal and calm, but after the officer arrived, the three individuals acted nervous and were observed pacing in an indecisive manner. Tr. at 58 and 171.

26. After a brief period, "Pariente" (Escobar-Velasquez) and Gutierrez-Sanchez were observed leaving the 7-11 on foot, walking briskly south on 300 West. Officers made a felony stop of those two individuals, commanding them to get on the ground with lights and sirens on the police vehicle, and guns drawn. They were detained and placed in handcuffs without incident. Tr. at 392-395.

27. "Pina" (Bautista-Medina) was located inside the 7-11 and was also detained in handcuffs without incident. Tr. at 395-396.

28. Officers contacted a drug detecting K-9 unit, who proceeded directly to the 7-11 from his location in Kimball Junction. Tr. at 259. Upon arrival, the K-9 was deployed on the exterior of the gold Nissan Maxima, whereupon the dog indicated to the odor of narcotics in the rear of the vehicle. Tr. at 262-263.

29. The Maxima keys were obtained from one of the occupants. Tr. at 399. The trunk was opened and the dog was deployed inside. No indication was made in the trunk. Tr. at 273. The dog was also deployed in the interior of the passenger compartment of the Maxima. The dog immediately indicated on a jacket or blanket covering a plastic grocery bag sitting on the rear floorboard of the Maxima. Tr. at 263-264. After removing the dog, officers looked under the

blanket and observed approximately 2 pounds of a substance which later tested positive for methamphetamine. Tr. at 264.

## CONCLUSIONS OF LAW

<u>Law Enforcement Agents Had Probable Cause to Search the Defendants' Vehicle</u>

Based on the facts presented at the evidentiary hearing, the Court finds that on August 25, 2011, agents had probable cause to search the gold Nissan Maxima in which two pounds of methamphetamine were located and seized. The detention and vehicle search in this case was not a <u>Terry</u> stop, and it was not subject to the limitations applicable to the scope of such stops. <u>Terry v. Ohio</u>, 392 U.S. 1 (1968). Under <u>Terry</u>, an officer's reasonable suspicion that a person may be involved in criminal activity permits the officer to stop the person for a brief time and take additional steps to investigate further. <u>Id.</u> at 20. A probable cause detention is not subject to the limitations applicable to <u>Terry</u> stops based on reasonable suspicion. <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984). The length of detention can be longer, and no additional investigation is necessary to support a search.

The Supreme Court has defined probable cause to search as "a fair probability that contraband or evidence of a crime will be found in a particular place." <u>Illinois v. Gates</u>, 462 U.S. 213, 238 (1983). "Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same and so are law enforcement officers .... [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." <u>Id</u>. at 231-32 (citing <u>United States v. Cortez</u>, 449 U.S. 411, 418 (1981)). Probable cause is "a fluid concept turning on the assessment of probabilities in particular factual contexts not readily, or even usefully, to a neat set of legal rules," and its existence determined by an analysis of the totality of circumstances surrounding the intrusion. <u>Illinois v. Gates</u>, 462 U.S. at 232, 238.

On August 23, 2011, agents intercepted a telephone call in which an individual known only as Pina told Javier Armenta that he (Pina) would be traveling to Salt Lake City within a day or two to deliver narcotics.  On August 24, 2011, agents tracked the telephone used to make that August 23rd call traveling from Modesto, California to Sacramento, California, and was headed East on Interstate 80 before tracking was lost. On the morning of August 25, 2011, agents learned through GPS tracking that same phone was located at an address on Orion Circle in Salt Lake City, Utah.  A series of three calls were intercepted on August 25, 2011 in which Pina told Armenta that he (Pina) was in Utah and had "two cousins" to bring to Armenta.  Agents believed based on previous use of the same terminology and prior drug seizures that the conversations actually involved two pounds of methamphetamine that Pina was bringing to Armenta that day. Agents knew through GPS tracking on Armenta's phone that he was at his restaurant on 3600 South State Street.  Agents determined from GPS tracking of the telephone used by Pina that he was at Orion Circle and was followed by agents to an apartment on Remmington Way.  Agents then observed Pina and two other Hispanic males proceed from the Remmington Way apartment toward Armenta's restaurant, taking the shortest and fastest route.  They stopped at a 7-11 convenience store on the way to get gas.  While at the 7-11, a marked police unit pulled into the same parking lot.  Agents observed that the three defendants became very nervous about the police being present, and two of the defendants began briskly walking away from the 7-11 down 300 West, leaving their car in the 7-11 lot.  Officers detained them as well as the third defendant who was located inside the 7-11. The defendants' vehicle was searched, and two pounds of methamphetamine were located in the rear passenger compartment.

Based on those facts, there was a fair probability that methamphetamine would be located in the defendants' vehicle.  Although some of the terminology used in the telephone calls had to be interpreted by agents, it was not at all difficult to determine that methamphetamine, and not literally "cousins", was being brought to Armenta by Pina.  That, combined with the route of

travel toward Armenta's restaurant after the phone calls had been intercepted that said Pina was coming, and the visible nervousness and abandonment of the vehicle in the 7-11 parking lot , established probable cause that a search of the defendants' vehicle would reveal contraband.

Law Enforcement Agents Had Reasonable Suspicion to Detain the Defendants

Even if the probable cause threshold was not met at the time the defendants were detained, the facts clearly established reasonable suspicion for agents to detain the suspects and to inquire further as to whether a crime was being committed. To justify an investigative detention, the detaining officer must have a reasonable, articulable suspicion that the detainee has been, is, or is about to be engaged in criminal activity. Terry v. Ohio, 392 U.S. at 21. "Reasonable suspicion is a less demanding standard than probable cause, not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause." United States v. Treto-Haro, 287 F.3d 1000, 1004 (10th Cir. 2002). Reasonable suspicion is a "particularized and objective basis for suspecting the person stopped of criminal activity." United States v. Callerman, 273 F.3d 1284, 1286 (10th Cir. 2001). The presence of reasonable suspicion is not determined by any one factor, but on the totality of the circumstances. Alabama v. White, 496 U.S. 325, 330 (1990); United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001). This approach is intended to avoid unrealistic second-guessing of police officers' decisions, United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir. 1994), and to accord appropriate deference to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions. United States v. Lopez-Martinez, 25 F.3d 1481, 1484 (10th Cir. 1994). Details which may be compatible with innocent behavior or explanation may be considered in the totality of the circumstances approach. United States v. Cervine, 347 F.3d 865, 871 (10th Cir. 2003) citing United States v. Arvizu, 534 U.S. 266, 277 (2002). The reviewing

court must consider whether the officer had sufficient articulable facts meriting further investigation to either confirm or dispel that reasonable suspicion.  Id.  Police officers need not close their eyes to suspicious circumstances.  United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986).  An officer's determination of reasonable suspicion may be based on both facts known upon making the stop, and those learned during the course of the stop.  United States v. Oliver, 363 F.3d 1061, 1067 (10th Cir. 2004).   In making a determination of reasonable suspicion, the relevant inquiry is not whether particular conduct is "innocent" or "guilty", but the degree of suspicion that attaches to particular types of noncriminal acts.  United States v. Sokolow, 490 U.S. 1, 10 (1989).   Law enforcement officers' training and experience in recognizing signs of drug trafficking is entitled to consideration and some deference, especially when those signs may be individually capable of innocent explanation.  United States v. Cervine, 347 F.3d at 871.  Even if witnessed conduct is by itself lawful, or is ambiguous and susceptible of an innocent explanation, "*Terry* recognized that the officers could detain the individuals to resolve the ambiguity."  Illinois v. Wardlow, 528 U.S. 119, 125 (2000).

As outlined above, agents had intercepted telephone calls indicating that Pina was delivering methamphetamine to Armenta.  Agents observed the three individuals with Pina's telephone traveling toward Armenta's restaurant.  Two of the individuals attempted to flee when they saw a marked police vehicle in their immediate vicinity.

In order to immediately confirm or dispel their suspicion, agents called for a trained drug-detecting K-9 to come to the 7-11 to do an exterior sniff of the defendants' vehicle.  Use of a police K-9 was the least intrusive means available to officers to confirm or dispel their suspicion that there was methamphetamine in the defendants' vehicle.  It is well-settled law in this Circuit that an alert by a trained drug-detecting dog, without more, provides law enforcement officers with probable cause to search the vehicle.  United States v. Ludwig, 10 F.3d 1523, 1527 (10th Cir. 1993); United States v. Ludwig, 641 F.3d 1243, 1250-51 (10th Cir. 2011).  The police K-9 "Jett"

indicated to the odor of narcotics emanating from the defendants' vehicle on the dog's first pass. Even if they didn't have probable cause before deploying the K-9, the dog's indication provided probable cause for agents to search the defendants' vehicle.

**ORDER**

IT IS HEREBY ORDERED that the Defendants' Motions to Suppress (Docket #153: Escobar-Velazquez; Docket #155: Gutierrez-Sanchez; Docket #169: Bautista-Medina) are hereby DENIED.

IT IS SO ORDERED this 22nd day of November, 2012.

_____
DAVID NUFFER
United States District Judge